UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LIANE BLANCHARD,

      Plaintiff,

v.

Case No. 5:17cv126-CJK

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,

      Defendant.

_____/

<u>MEMORANDUM ORDER</u>

      This matter is before the court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Liane Blanchard's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in the case, including entry of final judgment.  Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are

supported by substantial evidence. The decision of the Commissioner, therefore, will be affirmed and plaintiff's applications for benefits will be denied.

## ISSUES ON REVIEW

Ms. Blanchard, who will be referred to as claimant, plaintiff, or by name, raises 3 issues on appeal. She argues defendant erred in (1) evaluating her credibility and evidence of substance abuse; (2) giving limited to weight to the opinion of consultative examiner Paul Tritsos, Ph.D.; and (3) finding evidence submitted to the Appeals Council does not provide a basis for changing the ALJ's decision.

## PROCEDURAL HISTORY

Ms. Blanchard filed applications for DIB and SSI on April 13, 2014, alleging disability beginning April 3, 2014, due to bipolar disorder, anxiety, panic attacks, diabetes, hypertension, and asthma.[1] T. 254-55, 427.[2] She appeared for a hearing before an Administrative Law Judge ("ALJ") on January 12, 2016. T. 191-257. On February 18, 2016, the ALJ issued a decision denying Ms. Blanchard's applications for benefits. T. 171-190. Ms. Blanchard petitioned the Appeals Council for review

---

[1] At the hearing, plaintiff amended the alleged onset date to April 23, 2014. T. 254-55.

[2] The administrative record, as filed by the Commissioner, consists of 14 volumes (docs.11-2 through 11-15) and has 894 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

Case No. 5:17cv126-CJK

of the ALJ's decision.  T. 165.  The Appeals Council denied the request.  T. 1-7.  The

ALJ's decision thus became the final determination of the Commissioner.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relevant to the

issues raised in this appeal:

- "The claimant meets the insured status requirements of the Social

   Security Act through March 31, 2016," the date last insured.  T. 176.

- "The claimant has not engaged in substantial gainful activity since April

   23, 2014, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and

   416.971 *et seq.*)."  T. 176.

- "The claimant has the following severe impairments: asthma/chronic

   obstructive pulmonary disease (COPD), type II diabetes mellitus,

   peripheral neuropathy of an ambiguous etiology (whether post-cardio

   vascular accident or somatoform disorder), migraine headaches, a

   schizoaffective disorder, an anxiety disorder, a panic disorder, and a

   substance abuse disorder, in remission (20 CFR 404.1520(c) and

   416.920(c))."  T. 176.

Case No. 5:17cv126-CJK

- "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." T. 177.

- "[T]he claimant has the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently.  She can stand/walk for four hours per eight-hour workday, and sit six hours per workday, with the need to alternate sitting for thirty minutes after every thirty minutes of standing/walking.  The claimant can push/pull as much as she can lift/carry.  She can frequently operate right foot controls, operate right hand controls, and handle and finger with her right hand. The claimant can frequently climb ramps and stairs, occasionally climb ladders, and scaffolds, and occasionally balance.  She can occasionally work with unprotected heights, moving mechanical parts, the operation of a motor vehicle, vibration, and dust, odors, fumes and pulmonary irritants.  The claimant is limited to performing simple, routine tasks and limited to simple work-related decisions.  She can frequently interact

with supervisors through casual conversations and interpersonal interactions. The claimant can frequently interact with coworkers through casual conversations and interpersonal interactions, and occasionally interact with the public through casual conversations and interpersonal reactions, but should not engage in complex financial transactions or extensive negotiations. She can tolerate changes in the work setting that are introduced gradually." T. 178.

- "The claimant is unable to perform any past relevant work (20 CFR 404.1565and 416.965)." T. 183.

- "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 404.969(a))." T. 184.

- "The claimant has not been under a disability, as defined in the Social Security Act, from April 23, 2014, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))." T. 184.

STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting*

*Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[3]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). To be eligible for disability benefits, a claimant must prove she became disabled prior to the expiration of her date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a) and (c); 20 C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in 5 steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from performing past relevant work, she is not disabled.[4]

5. Even if the claimant's impairments prevent her from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

Step 5 (or step 4 in cases in which the ALJ decides a claimant can perform past work) is generally where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. The ALJ establishes RFC, utilizing the impairments identified at step 2, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step 5.[5] "[R]esidual functional capacity is the most [a

---

[4] Claimant bears the burden of establishing a severe impairment that keeps her from performing past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

[5] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

claimant] can still do despite [claimant's] limitations.[6] 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

## FACT BACKGROUND[7]

Ms. Blanchard was 45 years old when the ALJ issued his decision. T. 16. She completed 2 years of college and worked as a cashier; front desk, general, and

---

[6] In addition to this rather terse definition of RFC, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 416.912(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons. (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[7] The medical and historical facts of this case, as set out below, were derived primarily from plaintiff's testimony at the hearing and also the administrative record.

Case No. 5:17cv126-CJK

administrative clerk; nursing assistant; electrocardiogram graph technician; administrative assistant; assistant manager; business analyst; and business manager. T. 199-208, 249-50, 428.  She alleged disability due to bipolar disorder, anxiety, panic attacks, diabetes, hypertension, and asthma, beginning April 23, 2014.  T. 255, 427.

Ms. Blanchard has a history of bipolar disorder, diabetes, and migraine headaches.  T. 208-10, 212-13.  She has difficulty speaking and, at times, cannot speak at all, which was diagnosed both as conversion disorder and possible stroke. T. 208-10.  She "suffer[s] from awful pain in [her] right side."  T. 210.  She uses a cane and walker, both of which she says were prescribed.  T. 210-11.  When Ms. Blanchard received insulin from a free clinic, approximately 2 months before the hearing, the pain in her leg began "kind of subsiding."  T. 213.

Ms. Blanchard testified she was attending Atlanta Metropolitan school in an effort to obtain an associate degree in social work and lacked only 8 classes when she had to quit as a result of "health issues."  T. 212.  The "health issues" consisted of an inability to concentrate because of "complex migraines" and inability to walk across campus.  T. 212.  After quitting school, Ms. Blanchard moved to Panama City,

Florida. T. 211-12. At the time she moved, Ms. Blanchard was "hearing voices" and could not sleep. T. 215. "Mentally it was really bad." T. 215. "[I]t's like another person is living inside of you. So having the bipolar and schizophrenia it's like a war zone in your head. It's – sometimes it's – I wouldn't say – sometimes they are bad voices and sometimes they're good voices. They are not suicidal voices." T. 215. She elaborated,

> for example, if I'm at work, if I try to work, this is the only example I can think of right now, it's that you may not be saying anything to me, but in my head you are holding a total conversation with me, and you – and then what I have found myself to do is because of the voices and everything in my head, if I go somewhere, I would have to repeat myself and say, excuse me, did you say something to me? Or, for example, if a ex-boss, you know, tells you to do something, it's like my mind, okay, did they tell me to do this or that? So it's like I have to – a lot of times re-track and, you know, make sure is that exactly what you said.

T. 215-16.

Ms. Blanchard also has a history of substance abuse – alcohol and cocaine. At the hearing, she said she "was using drugs to self-medicate because [she] was trying to stop the voices in [her] head." T. 217. She testified she "started drinking when [she] was like six years old." T. 217. She used cocaine "off and on since about 2002,

'3, something in that area," and relapsed in 2014. T. 217-18. She "went into the mental hospital." T. 217. She suddenly "couldn't remember anything." T. 218. She said "I guess I had a break between the alcohol and the drugs at that time. I didn't have any medication at that time, so I was really trying to self-medicate." T. 218. She explained, "[a]ll I know is that I went to the Riverdale Police Department, and I said, I don't know who I am." T. 218. Although she was using both alcohol and cocaine, "[t]he alcohol was outweighing everything." T. 219. At the time of the hearing, she purportedly had been clean and sober for over a year and was attending daily AA and NA meetings.[8] T. 219-20.

After moving to Florida, Ms. Blanchard re-enrolled in college but completed only 1 semester in the fall of 2014. T. 221-22. "[D]ue to the fact of the complex headaches . . . when [she] could not speak properly, when [she] was slurring [her] words, [she could not] focus, the voices in [her] head, all of that, that wasn't a good combination to try to finish in." T. 222. She said the voices have been in her head when she was in class and detract from her ability to learn. T. 232. She "tr[ies] not to listen to them" and "tr[ies] to be very slow to make sure it's [her] and not her

---

[8] The medical records indicate plaintiff resumed using/abusing alcohol at some point thereafter. T. 20, 120, 143. There also is an indication she resumed using/abusing cocaine. T. 40. And she smoked between 1 and 3 packs of cigarettes per day. T. 20, 120, 143.

voices," but they get in the way at times.  T. 232.  Attending college was more difficult for her than working because "when you take classes, A, you've got to deal with people.  You have to be out in the community, you know, like on campus. And you're not isolated." T. 225-26.  She prefers to be isolated "[b]ecause like I said with me not knowing when a – I mean, I know when a person is saying something, but when it's quiet, my brain is like you're still having a conversation with me, and then I don't know how to process it so." T. 226.  When asked if school was stressful, Ms. Blanchard replied, "Oh yes.  It is very stressful, and having complex migraines not being able to really communicate, yeah, it was very stressful."  T. 226.

The ALJ asked Ms. Blanchard about her headaches.  She said she has headaches "three to four times a week, and if it's really bad, [she can] have them for 7 days straight, 7 to 8 days straight." T. 227.  She said she has a headache most days, that lasts for 6 hours.  T. 227.  She must "be in the dark" and "[c]annot hear anything." T. 227.  She is "very sensitive." T. 228.  She has no migraine "maybe three days out [of] the month" and bad migraines 2 to 3 days a month.  T. 228.  When the headaches are bad, she "cannot speak or communicate." T. 228.  She "throw[s] up." T. 228.  Her "legs start to hurt. [She] really cannot move, and . . . just lay[s] in the bed basically." T. 228-29.  She "wear[s] sunglasses in the house." T. 229.  If "the

pressure gets so bad," she goes to the emergency room. T. 229. She saw a neurologist for headaches, but due to lack of insurance, she had to be placed on a waiting list to receive "another charity appointment." T. 238. In December 2015, however, Ms. Blanchard's doctor prescribed Topamax, which she apparently has been taking and helps at least "a little bit" with the migraines. T. 213-14.

The ALJ also questioned Ms. Blanchard about diabetes. She said she was diagnosed in 2012. T. 232. When she was in the hospital, she was given insulin and told to continue it. T. 232. She did not have insurance, though, and did not qualify for free insulin. T. 232. Her blood sugar levels were like "a roller coaster," ranging from 65 or 70 in the morning to 165 or 190 around lunchtime. T. 233. Her feet would swell, which caused them to burn. T. 234-35. She had pain and weakness in her right upper leg and occasional weakness in her right arm approximately 3 times a month, the latter of which rendered her unable to do things like open jars and pick up small items. T. 235-36.

It took her "from 2012 until approximately three months [before the hearing] to receive insulin," which she administers once a day. T. 232-34. She also began wearing a monitor to track her blood sugar levels. T. 233-34. Once she received

treatment, her blood sugar level evened out, remaining in the 125 to 135 range all day for the couple of weeks leading up to the hearing. T. 233.

Ms. Blanchard said she might return to school at some point, but could only take 1 class at a time. T. 238. In order to do that, she felt she "need[ed her] mental health medication. I need to be able to take that on a regular basis and not, you know, skip around. And I just, mentally, if I can become balanced then I think that I can, you know, do better." T. 238. Ms. Blanchard described rapid mood swings, when she will "just start throwing things or start screaming." T. 245. A change of music or change of setting can trigger the swings. T. 245. Her mental health has been a struggle without medication; she needs Seroquel, in particular. T. 241-42.

Ms. Blanchard also has asthma/COPD. T. 239. She has an inhaler and uses a nebulizer twice a day. T. 239. The medication "helps [her] breathe better. If [she doesn't] use it, [she] wheeze[s], and [has] shortness of breath." T. 240. Although both the inhaler and nebulizer administer Albuterol, Ms. Blanchard said she must use the nebulizer and would be required to use it once during an 8-hour workday. T. 240-41.

On a typical day, Ms. Blanchard tries to read. T. 242. She prefers biographies and has been reading the same book for a year and a half. T. 243. She also quilts for

about 3 hours once or twice a month, using a sewing machine, and goes outside in the yard to sit and watch squirrels. T. 242-44. She watches the news. T. 245. Mostly, though, she sleeps. T. 242.

## ANALYSIS

1.      Credibility Determination/Evaluation of Evidence of Substance Abuse

Ms. Blanchard first challenges the ALJ's credibility determination. A claimant who attempts to prove disability based on subjective complaints must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of her alleged symptoms or evidence establishing her medical condition could reasonably be expected to give rise to the symptoms alleged. *See* 20 C.F.R. §§ 404.1529(a), (b), 416.929(a), (b); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26. If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms but the claimant establishes she has an impairment that could reasonably be expected to produce the symptoms alleged, the ALJ must evaluate the intensity and persistence of the claimant's alleged symptoms and their effect on the claimant's ability to work. *See* 20 C.F.R. §§ 404.1529(c), (d), 416.929(c), (d); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26. Notably, in determining whether substantial evidence supports an ALJ's credibility determination, "[t]he question is not . . .

Case No. 5:17cv126-CJK

whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Here, the ALJ considered Ms. Blanchard's allegations of disabling limitations. T. 179-82. Based on his review of the record, the ALJ found Ms. Blanchard's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. T. 179. The ALJ's decision regarding plaintiff's credibility is supported by substantial evidence in the record. Although the medical findings may provide an objective basis for some of plaintiff's impairments and other symptoms, they do not reflect symptoms of disabling severity. For example, as the ALJ noted, plaintiff's allegations of disabling symptoms are inconsistent with her daily activities, which include reading books, quilting with a sewing machine, going outside to watch squirrels, and watching the news. T. 179, 242-45. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (daily activities in subjective complaint analysis). Moreover, Ms. Blanchard is able to take care of personal hygiene, do chores around the house, cook, shop, attend AA and NA meetings, and walk or take the trolley for transportation when needed. T. 288.

The ALJ also found plaintiff's allegations of disabling physical symptoms inconsistent with the objective medical evidence, including claimant's treatment history, diagnostic test results, clinical signs, reported symptoms, medications, and other prescribed treatment. T. 179. On April 23, 2014, for instance, Ms. Blanchard's blood pressure was controlled, her blood sugar was 98 that morning, and she had clear lungs and no edema in the extremities. T. 699. On September 15, 2014, she had decreased lung sounds but was doing well with regard to diabetes. T. 40. And by September 22, 2014, her lungs were clear. T. 839.

In February 2015, Ms. Blanchard had a cough and congestion, but the symptoms stemmed from a 2-day upper respiratory infection, and her lungs were clear by March 4, 2015. T. 836-37. On March 11, 2015, Ms. Blanchard went to the emergency room complaining of chest pain and shortness of breath for 2 days. T. 771. She acknowledged she had not been using Albuterol. T. 771. She also denied radiation of numbness/weakness and leg swelling. T. 771. She reported she used a cane daily, but there is no indication the cane was prescribed by a physician. T. 771. *See* SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996) (medical documentation required to establish need for hand-held assistive device). Ms. Blanchard had full range of motion in all extremities, intact motor strength and

sensation, normal respiratory effort, and no rales or rhonchi. T. 773. On March 18, 2015, her lungs were clear. T. 835.

Plaintiff went to the hospital on September 9, 2015, with a headache, blurred vision, nausea, and vomiting. T. 807. She reported the headache began that morning and denied previous migraine headaches during adulthood. T. 807. A CT scan of the brain was unremarkable, and Ms. Blanchard's blood pressure was relatively controlled with medication. T. 800. The symptoms resolved, and she was discharged the next day. T. 800. On October 21, 2015, Ms. Blanchard had decreased lung sounds, but her lungs were clear by November 4, 2015. T. 832-33. The results of physical examinations on November 4, November 30, and December 17, 2015, were largely unremarkable. T. 830-32. On December 22, 2015, Ms. Blanchard was diagnosed with "intermittent" migraines. T. 798.

Given the fairly unremarkable findings over the period in question, substantial evidence supports the ALJ's finding regarding plaintiff's statements concerning the intensity, persistence, and limiting effects of her physical symptoms. As the ALJ noted with regard to plaintiff's migraines, although the record reflects a history of migraine headaches, there are limited references to migraines in the record during the

relevant period. The ALJ nevertheless accounted for "pain distraction from the headaches" in formulating the mental RFC. T. 181.

As with physical limitations, however, the ALJ found plaintiff's allegations regarding mental limitations inconsistent with the evidence of record. T. 181. As the ALJ noted, Ms. Blanchard purportedly quit using drugs in April 2014. T. 718. On June 4, 2014, she reported improvement as a result of Seroquel in terms of the voices in her head. T. 721. Although she felt depressed and anxious, she denied suicidal ideation, difficulty eating and sleeping, physical aggression, medication side effects, and cocaine and alcohol use. T. 721. On examination, she was fully oriented, with appropriate mood, congruent affect, normal thought content, goal-oriented thought processes, age-appropriate intellectual functioning, fair attention, appropriate appearance and motor behavior, normal speech, and fair insight and judgment. T. 722. Weeks later, she reported doing well with no symptoms of psychosis, depression, anxiety, or mania; she also said she was eating and sleeping well, had no suicidal ideation, and was experiencing no medication side effects. T. 767.

In July 2014, Ms. Blanchard reported "episodic" auditory hallucinations; her mood was fairly well controlled, however, and she had no other complaints or concerns. T. 764. The following month, Ms. Blanchard reported continued episodic

auditory hallucinations and occasional tactile hallucinations. T. 761. The symptoms had disappeared, however, by September 3, 2014, when she reported the "voices are gone" and had a good mood with no suicidal ideation. T. 755. In October 2014, Ms. Blanchard denied symptoms of psychosis, and her mood was stable and her sleep improved. T. 752. She denied having psychotic symptoms on November 17, 2014, even though she was taking no antipsychotic medication at the time. T. 749.

On February 3, 2015, Ms. Blanchard had "slight" auditory hallucinations "occasionally," despite having been unable to afford medication. T. 743. On April 1, 2015, she still was doing well without medication, with no symptoms of psychosis, mania, compulsions, post-traumatic stress, or depression. T. 740. On May 27, 2015, Ms. Blanchard complained of depression, anxiety, and being overwhelmed. T. 737. She reported stressors related to school and said she needed medication for sleep and mood stability. T. 737. On June 24, 2015, after restarting Seroquel, Ms. Blanchard was doing well, with no complaints or concerns. T. 734. She stated she was functioning well and planned to resume school and work. T. 734. On October 10, 2015, Ms. Blanchard was "doing good overall," with no medication side effects, suicidal ideation, auditory hallucinations, or paranoia. T. 731. She had pressured speech and an anxious mood, but she showed full orientation, appropriate mood and

affect, normal thought content, intact and appropriate thought processes, intact memory, appropriate appearance, good attention, appropriate motor behavior, and good insight and judgment. T. 732.

In short, the evidence does not bear out that Ms. Blanchard suffered symptoms of mental conditions that rendered her unable to work. Instead, the evidence shows her symptoms improved over time. Claimant's allegations regarding the severity of her mental limitations also are inconsistent with the opinion of State Agency psychological consultant Maxine Ruddock, Ph.D., whose opinion the ALJ gave great weight. T. 182. Dr. Ruddock noted plaintiff does chores around the house, cooks, shops, performs personal grooming, attends AA and NA meetings, and walks or takes the trolley for transportation because she has no vehicle. T. 288. Dr. Ruddock found Ms. Blanchard's allegations only partially credible and concluded Ms. Blanchard did not have a mental impairment of a marked level of severity, with only mild restriction of activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence, and pace; and no repeated episodes of decompensation of extended duration. T. 288-89. Plaintiff's allegations of disabling mental limitations thus are inconsistent with the evidence of record, and the ALJ

properly discounted them. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v) (treatment in assessing subjective complaints).

Plaintiff claims the ALJ did not consider testimony she had abstained from drugs and alcohol since before the amended alleged onset date. The ALJ referenced plaintiff's past history of alcohol and cocaine abuse; he also acknowledged plaintiff had not used drugs since April 2014, before the alleged onset date. T. 179, 181, 718, 721, 216. In fact, the ALJ determined plaintiff had a "severe" impairment of "a substance abuse disorder, *in remission*." T. 176 (emphasis added). The ALJ thus plainly incorporated plaintiff's testimony regarding drug and alcohol abuse into his decision.

There is no indication, however, the ALJ discounted the severity of plaintiff's condition based on past drug and/or alcohol abuse. Indeed, the ALJ merely observed plaintiff functioned effectively until a cocaine-induced decompensation prior to the amended alleged onset date. Such an observation does not amount to a "juxtaposition of descriptions of the claimant's condition with statements concerning the claimant's use of drugs and alcohol," as plaintiff contends. Doc. 15 at pp. 10, 13. And it does not indicate in any way that the ALJ implicitly determined substance abuse would be

a material factor in a disability determination, an issue the ALJ did not need to reach in this case given his finding plaintiff was not disabled.

Plaintiff also contends the ALJ failed to consider testimony she lacked health insurance and could not afford additional treatment or prescribed medication during the relevant period. The ALJ is required to consider affordability of treatment only when a lack of treatment is the primary basis for an adverse credibility finding. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (holding an ALJ must consider excuses for noncompliance only when it is the "sole ground for the denial of disability benefits"). The ALJ nevertheless expressly acknowledged plaintiff's treatment options were limited due to financial considerations. T. 181, 743. Contrary to plaintiff's assertions, therefore, the ALJ considered the financial obstacles to obtaining treatment. He also found treatment effective when plaintiff was able to obtain it and that her conditions were not of disabling severity even when she could not.

Even assuming the ALJ erred with regard to consideration of plaintiff's substance abuse and inability to afford treatment, plaintiff has shown no harm from the alleged errors because the ALJ did not rely exclusively on those factors in finding her not entirely credible. Instead, the ALJ relied on a number of factors, including

the objective medical evidence, medical opinions, treatment history, subjective complaints, and activities of daily living, all of which contradict plaintiff's allegations of disabling symptoms. *See Wilson v. Comm'r of Soc. Sec.*, 500 F. App'x 857, 859-60 (11th Cir. 2012) (finding remand unwarranted even if ALJ cited an improper reason in support of adverse credibility determination because sufficient evidence supported other reasons for ALJ's adverse determination). Moreover, the ALJ largely incorporated plaintiff's complaints in the RFC, imposing limitations supported by the record. Hence, although Ms. Blanchard testified to severe limitations that preclude her from working, there simply is no indication in the record Ms. Blanchard suffers from any condition precluding her from working at the prescribed RFC.

2.    Opinions of Consultative Examiner Paul Tritsos, Ph.D.

Plaintiff argues the ALJ erred in evaluating the opinions of one-time examiner Paul Tritsos, Ph.D., regarding certain "marked" limitations. T. 725-29. In evaluating medical opinions, an ALJ considers numerous factors, including whether the doctor examined or treated the claimant, the evidence the doctor presents to support his opinion, and whether the opinion is consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A treating source's opinion generally is entitled to more weight, and an ALJ must give good reasons for discounting a treating

source's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The opinion of a non-treating physician, however, is not entitled to any deference or special consideration. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (c)(2), 416.902, 416.927(c)(1), (c)(2); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877-78 (11th Cir. 2013); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).

As the ALJ noted, on August 5, 2015, Dr. Tritsos opined plaintiff had marked limitations in carrying out complex instructions and making judgments on complex work-related decisions and moderate limitations in making judgments on simple work-related decisions, understanding and remembering complex instructions, responding to usual work situations and changes in a routine work setting, and interacting appropriately with the public, supervisors, and coworkers. T. 182, 727-28. The ALJ found Dr. Tritsos' opinions to be of "limited use because the claimant did not appear to disclose her cocaine use to Dr. Tritsos [so] that he could determine whether her schizoaffective disorder and subsequent symptomatology resulted from her cocaine relapse, or was independent of it." T. 182. The ALJ nevertheless credited and gave great weight to Dr. Tritsos' opinion Ms. Blanchard was capable of

activities of daily living, experienced levels of social withdrawal, and had trouble with concentration and focus.  T. 182-83.

Dr. Tritsos found plaintiff could recall 3 of 3 words after a short delay, perform serial 7s somewhat successfully, and spell the word "house" forward but not backward.  T. 725-26.  Although she had a constricted affect and anxious mood, Ms. Blanchard did not experience any hallucinatory symptoms during her session.  T. 726. Moreover, she could drive, shop, handle her finances, prepare food, do laundry and other chores, and perform self-grooming to a fair extent.  T. 726.  The ALJ concluded such clinical findings and activities did not support Dr. Tritsos' opinions to the extent they were more limited than the ALJ's RFC finding.  Substantial evidence supports the ALJ's decision in that regard.

Plaintiff's argument that Dr. Tritsos was aware of her history of polysubstance abuse fails to undermine the ALJ's reasoning.  As the ALJ discussed, on March 8, 2014, prior to her amended alleged onset date, Ms. Blanchard was hospitalized after relapsing on cocaine and was diagnosed with bipolar disorder, NOS, and polysubstance dependence.  T. 217-19, 676-79.  The ALJ discussed plaintiff's subsequent mental health treatment throughout the relevant period, which showed improvement after the March 2014 hospitalization.  T. 178-83.  Dr. Tritsos also

discussed plaintiff's mental health treatment in 2014, including her report of a psychiatric hospitalization for "psychotic catatonia," but he made no mention of Ms. Blanchard's cocaine relapse in 2014, much less that it was the reason for the hospitalization. T. 725. The only other references to drug use in Dr. Tritsos' report are notations that plaintiff reported a "history of polysubstance abuse" during an unspecified period as a basis for disability and "denies use of alcohol or other drugs." T. 725.

It appears Dr. Tritsos was not aware plaintiff's symptoms and psychiatric hospitalization shortly before the amended alleged onset date in 2014 were associated with a cocaine relapse, and it is unclear whether he attributed those symptoms to plaintiff's other mental impairments. *See* 20 C.F.R. §§ 404.1527(c)(3), (c)(6), 416.927(c)(3), (c)(6) (extent to which the medical source considered other pertinent evidence in the claim file). Plaintiff's testimony supports the fact Dr. Tritsos was not fully aware of her medical history, as she confirmed Dr. Tritsos would be correct if he indicated she denied alcohol or drug use but said she went to AA. T. 245. Because Dr. Tritsos' knowledge of plaintiff's medical history appears to have been incomplete, the ALJ reasonably discounted his opinions in part. *See, e.g., Ross v. Astrue,* No. 1:11CV631-WC, 2012 WL 3543324, at *7 (M.D. Ala. Aug. 16, 2012)

(finding "[t]he ALJ properly considered and assigned 'some weight' to Dr. Lopez's opinion regarding Plaintiff's mental impairments because Dr. Lopez failed to account for the effect of substance abuse on Plaintiff's impairments. . . . In this case, there is no evidence that Dr. Lopez considered whether Plaintiff's substance abuse was a 'contributing factor' to Plaintiff's purported disability and, thus, the ALJ did not err in not assigning substantial weight to Dr. Lopez's opinion.") (citing cases).

Even if the ALJ erred with regard to Dr. Tritsos' opinions, such error would be harmless. As an initial matter, the opinion of a one-time examining physician, such as Dr. Tritsos, is not entitled to any special weight or consideration. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (c)(2), 416.902, 416.927(c)(1); *Denomme*, 518 F. App'x at 877-78; *Crawford*, 363 F.3d at 1160. In assessing plaintiff's RFC, the ALJ considered all the relevant evidence, including her cocaine relapse shortly before the amended alleged onset date, which—along with other extensive longitudinal medical and non-medical evidence of record—Dr. Tritsos did not discuss. T. 725-29. Further, Dr. Tritsos' opinions are not clearly inconsistent with the ALJ's RFC finding. T. 178, 725-29. In fact, the ALJ largely credited Dr. Tritsos' opinions. T. 183. While the ALJ excluded from the RFC determination Dr. Tritsos' findings regarding "marked" limitations, the ALJ did not find plaintiff could carry out complex

instructions or make judgments on complex work-related decisions. T. 178. Instead,

the ALJ found Ms. Blanchard could perform only simple, routine tasks and make

simple work-related decisions. T. 178. Such finding is not inconsistent with Dr.

Tritsos' finding plaintiff had marked restrictions in those areas. T. 727. Because the

ALJ's decision does not clearly conflict with Dr. Tritsos' opinions, plaintiff has

shown no harmful error warranting remand.

Plaintiff argues any error is harmful "because vocational witness testimony at

the hearing established that additional mental limitations consistent with Dr. Tritsos'

opinion would preclude [plaintiff's] ability to sustain any gainful employment." Doc.

at 17. The record does not support that assertion. T. 253-54. The vocational expert

did not testify as to whether "marked" limitations in plaintiff's ability to carry out

complex instructions and make judgments on complex work-related decisions would

limit or preclude her performance of other jobs he identified. T. 252-54. To the

contrary, the vocational expert testified if Ms. Blanchard were even more limited in

some work-related mental abilities than the RFC finding – *i.e.*, additional restrictions

to repetitive tasks or occasional interaction with supervisors – she would nonetheless

remain able to perform other work. T. 252-53. The vocational expert testified she

could not perform other jobs with various other limitations, but none pertaining to the

"marked" limitations Dr. Tritsos imposed. T. 252-53. The vocational expert's testimony therefore does not support plaintiff's position and, instead, provides further support for the ALJ's decision.

Plaintiff also contends the ALJ erred in implicitly determining substance abuse would be a material factor in a determination of disability, without making a separate materiality determination. This claim also lacks merit. The SSA precludes the award of benefits when drug or alcohol abuse is a contributing factor material to the finding of disability. *See* 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 404.1535, 416.935; *Doughty v. Apfel, Comm'r, Soc. Sec. Admin.*, 245 F.3d 1274, 1278 (11th Cir. 2001). If a claimant is found disabled and there is medical evidence of substance abuse, the ALJ must determine whether the abuse is "a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a); *see Doughty*, 245 F.3d at 1279. Substance abuse is material to the disability determination "if the claimant would not meet our definition of disability if he or she were not using drugs or alcohol." SSR 13-2p, 2013 WL 621536, at *4; *see* 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). Accordingly, the drug and alcohol abuse regulations apply only if the ALJ finds the claimant disabled. *See* 20 C.F.R. §§ 404.1535(a), 416.935(a); *Doughty*, 245 F.3d at 1279.

Here, the ALJ evaluated plaintiff's claim using the 5-step sequential evaluation process and concluded plaintiff was not disabled because she could perform a range of light work. T. 178. Because the ALJ found plaintiff not disabled despite prior drug use, the ALJ was not required to make a materiality determination. *See* 20 C.F.R. §§ 404.1535(a), 416.935(a); *Doughty*, 245 F.3d at 1279. The ALJ, however, was not precluded from acknowledging and considering prior substance abuse, particularly as regards the weight afforded to Dr. Tritsos' opinions. The ALJ thus followed proper legal standards in evaluating plaintiff's claim.

*Davis v. Colvin*, No. 3:14-cv-103-CJK, 2015 WL 692652 (N.D. Fla. Feb. 18, 2015), on which plaintiff relies, is factually distinguishable. In *Davis*, the ALJ found the claimant had "severe" impairments during the relevant period that included opiate and amphetamine abuse and alcohol abuse. *Id.* at *1. The ALJ attributed decreases in the claimant's Global Assessment of Functioning scores and medical opinions regarding his mental condition during the relevant period to the his use of drugs or alcohol at those times. *Id.* at *2. The court determined the ALJ "cited claimant's drug and alcohol use as support for discounting the severity of his condition" and, in doing so, "implicitly determined that substance abuse would be a material factor in a finding of disability." *Id.* at *6.

Case No. 5:17cv126-CJK

In this case, the ALJ found plaintiff had the "severe" impairment of a "substance use disorder, in remission." T. 176. The ALJ repeatedly referred to plaintiff's history of substance use, T. 179, 181, acknowledged her cocaine relapse occurred prior to the amended alleged onset date, T. 177-78, 676, and noted she had ceased using drugs by April 2014, T. 181, 718. Unlike in *Davis*, the ALJ neither found plaintiff was using substances during the relevant period nor discounted her condition at any time during the relevant period due to drug or alcohol use. Plaintiff's reliance on *Davis*, therefore, is misplaced.

In sum, Plaintiff has not met her burden of showing error, much less harmful error, in the ALJ's assessment of Dr. Tritsos' opinion. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). Substantial evidence supports the ALJ's decision to discount portions of Dr. Tritsos' opinions based on his apparent unfamiliarity with plaintiff's full medical history.

3.    Evidence Submitted to the Appeals Council

Finally, plaintiff avers defendant erred in refusing to consider evidence newly submitted to the Appeals Council. If a claimant submits new, noncumulative, and material evidence to the Appeals Council after the ALJ's decision, the Appeals

Council must consider the evidence, but only where it relates to the time period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b). "Material" evidence is evidence that is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987) (internal marks omitted).

When evidence is submitted for the first time to the Appeals Council, the new evidence becomes part of the administrative record. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1067 (11th Cir. 1994). The Appeals Council considers the entire record, including the new, material, and chronologically relevant evidence, and will review the ALJ's decision if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). The role of this court is to "review whether the new evidence renders the denial of benefits erroneous." *Ingram*, 496 F.3d at 1262.

Ms. Blanchard submitted additional treatment records dated between March 30, 2016, and December 24, 2016, to the Appeals Council.[9] T. 9-154. The records

---

[9] Claimant submitted a number of additional records dated before the ALJ's decision, which the Appeals Council considered and included as exhibits but found did not provide a basis for changing the ALJ's decision. T. 5. Because plaintiff does not challenge the Appeals Council's decision with respect to these records, *see* Pl.'s Br. at 17-18, the undersigned will not address them further. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *see also* doc. 12, p. 2.

document visits for medication refills and follow-ups, with some emergency room visits for issues such as a nutmeg reaction, migraine symptoms, abdominal pain, hip pain stemming from a fall, syncope, an asthma attack, and other symptoms that began the day or day before plaintiff sought treatment. T. 9-154. The Appeals Council declined to consider the additional evidence, finding it not chronologically relevant to the ALJ's February 18, 2016, decision. T. 2. Evidence is "chronologically relevant" only if "it relates to the period on or before the date of the [ALJ's] hearing decision." *Stone v. Soc. Sec. Admin., Comm'r*, 658 F. App'x 551, 553 (11th Cir. 2016) (*quoting* 20 C.F.R. §§ 404.970(b), 416.1470(b)). The undersigned has reviewed the evidence submitted to the Appeals Council and need not find whether the Appeals Council properly declined to consider the newly submitted evidence based on chronological relevance because the evidence is not material.

As set forth above, evidence is "material" where, "if accepted, 'there is a reasonable possibility' that [it] 'would change the administrative result.'" *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015) (*quoting Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987)). The additional records do not contain any objective medical findings or other evidence that would undermine the ALJ's decision regarding plaintiff's condition during the relevant time. The

evidence shows, as plaintiff points out, that Ms. Blanchard received treatment in the emergency room in June and July 2016 for complex migraines and left-sided weakness, as well as an overnight hospitalization in December 2016 (some 9 months after the date last insured) for acute exacerbation of asthma and shortness of breath. T. 9-72, 112, 117-39. The evidence also shows Ms. Blanchard denied symptoms such as headaches, back pain, muscle pain, joint pain, weakness, depression, anxiety, hallucinations, delusions, memory problems, and gait disturbances. T. 27, 75, 90-91, 99, 140. Moreover, findings on physical and mental status examination, as well as diagnostic testing of plaintiff's brain/head, chest/thorax, lumbar spine, and stomach, were generally unremarkable T. 35-37, 69-70, 78-79, 82, 90, 94, 102-03, 107, 114, 120, 123, 143.

Notably, a July 26, 2016, progress note from the Avicenna Free Clinic, at which plaintiff sought treatment for "flu" symptoms, indicates plaintiff was working at the time despite having "complex migraines by stress." T. 112. The provider indicated plaintiff could work 32 hours per week. T. 112. A July 19, 2016, record from Bay Medical Center likewise indicates plaintiff was working. T. 117. Hence, not only is there insufficient evidence of a condition precluding plaintiff from working during the relevant time or shortly thereafter in the newly submitted

evidence, but the evidence suggests plaintiff in fact was working and was capable of working 32 hours a week despite her symptoms. Plaintiff thus has not shown the additional records establish a basis for remand.

## CONCLUSION

Although the record shows Ms. Blanchard suffers from impairments, substantial evidence supports the Commissioner's decision that such impairments do not render her unable to work at the light exertional level, with the limitations the ALJ imposed. The Commissioner's decision is supported by the record and by application of the proper legal standards and, thus, should be affirmed.[10] *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

**ACCORDINGLY it is ORDERED:**

1.  The decision of the Commissioner is AFFIRMED and plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income are DENIED.

---

[10] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Gilson v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Case No. 5:17cv126-CJK

2.    The clerk shall enter judgment for defendant and close the file.

**DONE and ORDERED** this 28th day of September, 2018.


                            /s/ *Charles J. Kahn, Jr.*
                            **CHARLES J. KAHN, JR.**
                            **UNITED STATES MAGISTRATE JUDGE**